THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
WALTER J. SIKORA, DEFENDANT-APPELLANT.

Argued October 5 and 6, 1964—Decided May 17, 1965.

454

*Mr. Bruno L. Leopizzi* argued the cause for appellant.

*Mr. Archibald Kreiger,* Assistant Prosecutor, argued the cause for respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J. Defendant Walter J. Sikora shot and killed Douglas Hooey in the early morning of January 15, 1962. Thereafter, on May 15, 1962, a jury found him guilty of murder in the first degree for the killing, and recommended life imprisonment. Following imposition of that sentence, he appealed directly to this Court. *R. R.* 1:2–1(c).

On this appeal defendant contends the trial court committed reversible error in denying two motions for mistrial, and in refusing to admit certain psychiatric testimony relative to defendant's capacity to premeditate the killing he committed. There is no substance to the charge of error with respect to the motions for mistrial. The grant or denial

thereof was a matter for the trial court's discretion. The record presents no sound reason for appellate conclusion that the action it took was arbitrary. The attack on the refusal to permit introduction of the psychiatric evidence, however, requires detailed consideration.

At the time of trial Sikora was 36 years of age, five feet, six inches tall and weighed 116 pounds. He had had an unfortunate childhood. His earliest recollection was of living in a Catholic Home in Bergen County when about five or six years old. He never had any visitors there, as the other children did, and he was lonesome and unhappy. At age seven the Child Welfare Board placed him in a foster home in Northvale, New Jersey. There he claims he was beaten and ran away. On being brought back he refused to stay and was transferred to an orphanage. After a few months there he was sent to the Hackensack Children's Home where he remained for about a year. Over the next few years he was in three foster homes. He was unhappy and received beatings for bedwetting. In the third home he was locked in his room for two weeks after which he ran away again. When picked up by the police he was sent to the Hackensack Child Welfare Home. He was then 15 years old. While there he said he was confined to an isolation room for a week at a time. At 16 years he was transferred and allowed to work in a bakery, but was made to work so hard he ran away again. Then he was committed to Jamesburg Boys Home where he got along fairly well and remained for about a year. Thereafter the authorities put him to work on a dairy farm in the area. He claimed the hours of work were from 4:00 A.M. to 7:00 or 7:30 P.M., for which he was paid $1 per week and room and board. Later he received $2 weekly. Permission was given to leave the farm and join the Merchant Marine when he was about 19 years old.

After three and one-half years he left the Merchant Marine and came to live in Paterson, New Jersey where he remained, except for Army service, until this crime was committed. The Army drafted him in 1955 and he was in service until Febru-

ary 1957. He was discharged at his own request "under honorable conditions." He told some of the psychiatrists who testified at this trial that intoxication and overstaying of leave played a part in his discharge. He was unhappy in the Army because he was 30 years of age when drafted and had to serve and work with 18- and 19-year-old boys.

Sikora returned to Paterson in February 1957. While there he worked as a general laborer, doing carpentry and painting until 1959 when he became employed in refrigeration and air conditioning installation. While engaged in the latter work, he had living quarters over his employer's shop. This remained his official residence until the shooting.

Sikora has never married and the companionship of women was infrequent. Most of his free time was spent alone and in nearby taverns where, apparently, he consumed large quantities of beer. In May 1959 while in a tavern he met a woman who was about 15 years older than he. About three months later, he moved into her apartment and lived with her as man and wife until December 29, 1961. They got along very well and after a time agreed to marry when they had saved a fixed amount of money. Subsequently while intoxicated, he was "rolled" and his savings stolen. This caused friction between them and both began to drink heavily. On December 28, 1961 they had an argument in the course of which Sikora literally turned her apartment "upside down." She had him arrested the next day and he was fined and ordered to leave her home. He did so, returning his belongings to the quarters over his employer's shop. (He was receiving unemployment compensation at the time, having been laid off during December.)

After the separation he telephoned her daily but she refused to speak to him. This upset him greatly. According to the defense psychiatric testimony at the trial, his relationship with her was a markedly dependent one, she being the dominant and aggressive party. He continued to frequent the D & D Tavern, a neighborhood establishment where he had first met her. On Friday, January 12, 1962, according to his

testimony, he attempted suicide at home by taking a large quantity of pills. The attempt was unsuccessful and he awoke about Sunday noon, January 14, sick but not seriously affected by the experience.

In the early afternoon of that day he wrote his erstwhile girl friend a letter and placed it in her mailbox. He made no effort to go into her apartment. Shortly thereafter he made a telephone call to her which was answered by a male voice, and he then went to the D & D Tavern. This was about 4:30 P.M. While drinking beer he noticed Douglas Hooey there. He had known Hooey casually as a frequenter of the tavern for about two years. Apparently he had had a flare-up with his female friend a short time previous over Hooey.

Sikora visited with a male friend in the tavern until about 9:30 P.M. when the friend left. Thereafter Sikora sat alone at the bar, and on several occasions Hooey would brush by him poking an elbow into his back. Then Hooey would stand nearby and grin, but Sikora had no words with him. On one occasion he overheard Hooey make a disparaging remark about the availability of Sikora's girl friend now that they had broken up. Between 11:00 and 12:00 P.M., after he had consumed 25 to 30 glasses of beer, he testified he was suddenly attacked by Hooey and two or three of his friends, badly beaten and kicked, and then thrown out of the tavern onto the sidewalk. When he arose he was cut and bleeding about the face, head and hands. (The State contended his hands were cut when he broke the glass panel of the door in attempting to re-enter the tavern.)

He walked home, entered his employer's shop, called the police and reported the incident. In a few minutes the police car appeared and he described what had occurred, asking that they accompany him back to the tavern. They declined unless he would ride to police headquarters and sign a complaint. On his refusal and declination of their offer to take him to the hospital, the officers departed.

Sikora went upstairs to his apartment and lay on the bed thinking of what had happened to him and his difficulty with

his female friend. While there (according to his testimony) he conceived the idea of killing himself. He said he was crying, and mixed up, and he took from its hiding place an automatic pistol which he had bought during his Merchant Marine service. The gun was fully loaded with eight shells in the clip and one in the chamber. He took the safety off and sat on the bed, but on second thought changed his mind about suicide, and decided to return to the tavern first to talk to Hooey about the fight. The gun had never been fired in the years he owned it. He left his building and went across the street to a shed and test-fired it until it was empty. Then he went back to his apartment, walked part way up the stairs, stopped and reloaded the gun with nine bullets. He took the bullets from a box containing over 50 of them which he had put in his pocket at the time he picked up the gun in his bedroom. According to his testimony, while reloading the gun he thought of the men who had assaulted him in the tavern. Then he "just lost his head" and started for the tavern to talk to Hooey and find out the reason for the attack. In this connection it may be noted that after the homicide and Sikora's arrest, police officers found in his apartment a bloodstained piece of paper on which he had written, "The first bullet is for Doug and the second is for Stella Miller." Although there was some equivocation in his confession, which admittedly was voluntarily given, and in his testimony as to when the note was written, the evidence suggests very strongly that it was written before he armed himself and left his apartment to return to the tavern in search of Hooey.

On leaving the apartment, he put the gun in his waist belt and zippered up his jacket far enough to hide it. Thinking there would be a number of persons in the tavern, he decided to use the alleyway entrance, and endeavor to get Hooey out that door so as to talk to him about the assault. As he neared the tavern he saw the lights go out, and he decided not to go in. It was about 3:00 A.M. which, apparently, is closing time. But as he passed the door he heard a woman remark in profane language that he was the one who had been beaten up

earlier. Looking back he saw Hooey coming out the tavern door. Hooey asked, "What the hell are you doing here?" Sikora testified he replied he wanted to find out why he had been beaten up. Both Hooey and the woman started to walk toward him, whereupon he drew the gun and told Hooey not to come closer. Hooey kept coming and Sikora began to back up, repeating his warning. Sikora said Hooey was grinning, and asked if Sikora thought "the thing will shoot." Sikora replied Hooey was "liable to find out" if he did not stop coming forward. Sikora knew the safety catch on the gun was off. There is an intersecting street a short distance from the tavern and Sikora was backing toward it. He stepped off the curb into the street with Hooey approaching him. At this time he fired and four shots entered Hooey's head and body killing him. Then he ran across the street, looked back and fired the gun in the air, shouting as he did, "All you bastards stay back."

From the scene of the killing he went to his girlfriend's house and rang the bell. There was no answer, so he kicked in the door. Not finding her at home he left and returned to his own apartment. Before departing, however, he attempted to retrieve from her mailbox the letter he had deposited there the previous afternoon. After getting it part way out of the box, he decided against taking it and pushed it back. Later the police found bloody finger marks on it. At his apartment he lay on the bed expecting the police to arrive in a short time. He reloaded the gun (he said) with the intention of shooting himself. About ten minutes later when the police appeared, the intention had not been executed.

The above factual outline represents the substance of Sikora's testimony and his voluntary confession. The confession, which fills 51 pages of the trial transcript, was signed in the early afternoon of the day of the shooting. It reveals a comprehensive recollection of the circumstances before and at the time of the fatal event. The psychiatrists who testified for the State and defense received very much the same history from Sikora at the time of their examinations. The State

contended that the facts in their totality demonstrated beyond a reasonable doubt that the defendant had committed a premeditated, deliberate and willful killing and was therefore guilty of murder in the first degree.

No defense of insanity was interposed. All the psychiatrists agreed Sikora was legally sane before and at the time of the shooting. Thus it was conceded that he knew the difference between right and wrong; he knew the nature and quality of his act, and he knew that it was wrong to kill.

The error asserted in this Court as requiring reversal of the conviction had its origin in one hypothetical question put by defense counsel to Dr. Noel C. Galen, a psychiatrist produced on behalf of the defendant.

Dr. Galen specializes in psychiatry and psychoanalysis. He received his M.D. degree in 1949. In addition to postgraduate work in neurology and psychiatry, he had three years of training as a psychoanalyst. This last training, he said, dealt with psychodynamics on a very detailed and sophisticated level. It taught him that people are a product of their own life history, their own genetic patterns, and that they all react differently under the stresses of their daily lives. As a result of his study and experience, he believes that mental disturbance and disorder, as distinguished from objective disease, are merely gradients, that people range from being essentially normal, perceiving the world substantially in its normal appearance, all the way to marked distortion of the thinking mechanism, and between the two extremes is a rather jagged line which is prone to and open to many variations. In short, all human behavior is distributed upon an infinite spectrum of fine gradations, there being no all or none in human dynamics. It is his view that mental disorder is one degree of an indeterminate line between gross disorganization and normal functioning, and it is often impossible to say at what point on the line a particular person is functioning at a given time. Mental illness or disorder in this context is a relative term as he sees it; it is a disorganization of the personality which causes a person to react in

a specific way to a specific kind of stress in a way characteristic for him.

Psychodynamics is the study of what makes a man "tick." In effect the doctor said its purpose is to seek an explanation of an individual's mental condition at a given time in terms of his lifelong emotional development; to relate his questioned conduct and its accompanying emotional symptoms to their long antecedent, predetermining factors. In appearing as a witness, Dr. Galen indicated his function was to help the court understand "the dynamics of what happened to this man with this particular history at this particular time in his life." It was not his place as a psychiatrist to consider the premeditation aspect of murder in terms of right or wrong or good or evil. Evil is a philosophical concept. In his view the psychodynamic psychiatrist cannot consider the aspect of first degree murder which in law requires the conceiving of a design to kill in terms of evil, or evil intent. These moral judgments are best left to the courts to decide. Such a physician deals with the problem in a scientific way by applying his knowledge of the "way people operate," his knowledge of stress and "the way people react to particular kinds of stress, based on their personality disorganization." He feels "somewhat medieval in talking about evil." Basically Dr. Galen's thesis is that man is a helpless victim of his genes and his lifelong environment; that unconscious forces from within dictate the individual's behavior without his being able to alter it.

By way of illustrating the area of psychodynamics under discussion, Dr. Galen referred to a physician friend who, while driving on a public highway, was cut off by another motorist.

"[T]his man who is a professional man knows clearly, in a general way, right from wrong, good from evil, if we want to get into that old controversy, but this man chased the car who cut him off and finally cut the car off that cut him off. Now, at this particular time, when he was behaving in this way, which was really endangering his life, endangering the lives of other people, although he was sane at

the time, he was acting in an irrational manner with a disturbance of his consciousness; and consciousness is a very difficult thing to define and understand unless one sees it as a dynamic."

The impression conveyed by this illustration is that under Dr. Galen's view of the dynamic relationship between the conscious and the unconscious, if his friend had killed someone with his car while pursuing the motorist who had offended him, he should not be held to criminal responsibility because he set out on the chase as the result of unconscious rather than conscious motivation. The idea seems to be that every deed, no matter how quickly executed, is never fully the result of the apparent immediate cause, and must be judged according to the probable unconscious motivations of an individual with the actor's lifelong history. Therefore, if in the opinion of the psychodynamically oriented psychiatrist, the deed, when evaluated against a background of the individual's life history, was probably produced by unconscious rather than conscious motivations, there was no *mens rea*, no criminal intent, and therefore no criminal guilt. In his view the conduct must be considered as having been conditioned by internal and external forces quite beyond the actor's control.

As we have indicated above, when Dr. Galen made his examination about four months after the homicide for about one and three-quarter hours, he obtained substantially the history detailed above. Sikora had a clear recollection of his previous life and of the events of the fatal night, and he was able to give the doctor a step-by-step account of the circumstances of the shooting. On the basis of the history, it was his opinion that at the time of the crime (and perhaps all his adult life) Sikora was suffering from a personality disorder of a passive-dependent type, with aggressive features. This kind of disorder is a function of his personality "which is his way of dealing with himself and with life and with people and with stress." He found no evidence of any overt hallucinations, delusions or ideas of reference; nor any evidence of organic mental disease. The accused's insight and judgment were consonant with his education, emotional status and

intellect; he was "estimated" to have a normal to dull-normal level of intelligence. He was sane and, according to the doctor, was able to distinguish between right and wrong. This means, of course, in the *M'Naghten* sense as Dr. Galen indicated he understood it, in the eyes of the law Sikora, in the necessary real and responsible degree knew right from wrong and had the requisite capacity to choose between them in deed. *M'Naghten's Case*, 10 *Clark & F*. 200, 8 *Eng. Rep.* 718 (*H. L*. 1843).

Defense counsel addressed a long hypothetical question to Dr. Galen which covered the examination of defendant, his life history, and particularly the events of the several hours preceding the shooting. It concluded with an inquiry as to whether in the doctor's opinion, in view of all those facts and circumstances, Sikora was capable of "premeditating a murder" at the time he killed Hooey. The objection of the State was sustained. No ground was given for the objection. Defense counsel's twice-repeated request to be heard on the law was summarily rejected. On asking the reason for the objection, the court said: "The record is complete. The doctor has testified that the defendant was sane."

We suggest for future guidance in similar situations that the jury be excused and counsel be permitted at least to make a proffer of the proof he expects to adduce by means of the question, and to present his argument with respect to the law claimed to support admissibility. But whenever an important evidence problem arises, one which may present a serious challenge to the judgment rendered at the trial if offer is rejected, we recommend that the proof be taken fully in the absence of the jury, and the argument heard as to its legal propriety. If at that point the trial court is convinced of the admissibility of the evidence, the questioning may be repeated in the presence of the jury. If not so satisfied, the objection naturally will be sustained. Such a course, as demonstrated by the instant case, will create a record which on a subsequent appeal will enable an appellate tribunal to understand clearly the specifics of the problem.

When the cause reached this Court, we felt the need for enlightenment as to the nature of the evidence sought to be elicited from Dr. Galen by the hypothetical question. Consequently a remand was ordered for the purpose of further testimonial examination of the doctor. Our direction was accompanied by a list of particular matters to be covered in the interrogation. Counsel were advised we felt the basic issues to be (1) whether the challenged question called for testimony which comes within the expertness of the witness and which has sufficient scientific support to warrant its use in the courtroom, and (2) if so, whether the answer the witness would give would aid the jury in reaching a decision. Consequently we directed that Dr. Galen be examined and cross-examined with respect to the following:

"(1) Prior to the events of the day of the homicide, did defendant suffer from a condition which medically constitutes a disease or illness of the mind? If so, what is that disease or illness?

(2) Did the events of the day of the homicide induce a condition which medically constitutes a disease or illness of the mind? If so, what is that disease or illness, and state what facts evidence that disease or illness.

(3) Was the witness prepared at the trial to testify that prior to the events of the day of the homicide defendant lacked the mental capacity to 'premeditate' as that term is defined by law (see *State v. Di Paolo*, 34 *N. J.* 279, 295 (1961)). If the answer is yes, state what facts are relied upon in support of that opinion.

(4) Was the witness prepared at the trial to testify that the events of the day of the homicide deprived defendant of his capacity to premeditate? If so, state the facts upon which that opinion is based and explain the mechanism whereby the specific events led to that incapacity.

(5) Was the witness prepared at the trial to testify that, although defendant had the capacity to premeditate, he nonetheless did not in fact do so? If so, state the facts upon which that opinion is based and explain how those facts lead to that opinion.

(6) If the answer to (4) or (5) is in the affirmative, develop the extent, if any, to which the witness had to accept as true, facts which were themselves in dispute or which depended upon inferences which a jury might but need not draw.

(7) If the answer to (4) or (5) is in the affirmative, what medical or technical sources will aid the Court in deciding whether it is within the expertise of one with this witness's qualifications to express an expert opinion.

By way of explanation of items (4), (5), (6) and (7), we point out that it is not a valid objection that a question put to an expert involves the very factual issue which the jury must decide, provided that the question truly calls for expert knowledge from the witness and thus contributes to the jury's understanding of a matter beyond the ken of the non-expert, as opposed to a question which merely asks the witness how he thinks a case should be decided. It is for this reason that the Court desires a full examination of Dr. Galen, to establish where his profession's expertise begins and ends, with such references to scientific works as will aid the Court in deciding whether the claimed expert knowledge is sufficiently established and reliable to warrant its introduction in the trial of a case.

The outline for examination given above shall not preclude either party from such further examination of the witness as that party believes will aid in this inquiry."

Pursuant to the remand Dr. Galen was recalled and re-examined. On that occasion he elaborated upon his training in psychiatry and psychoanalysis. He explained further the personality disorder claimed to exist in Sikora and the significance of psychodynamics in human behavior with respect to that disorder. In addition he furnished a list of medical authorities on which he placed reliance to support his conclusions. The substance of the additional statements on those subjects has already been included above in connection with the outline of the doctor's qualifications and medical theories. The conclusion fairly to be drawn from his testimony and the authorities cited is that as a psychodynamically oriented psychiatrist he believes all human conduct charged to be criminal should be judged not as the criminal law judges it, i. e., in terms of *mens rea* and whether it represents an exercise of free will, but whether from a rational scientific viewpoint it represents psychologically predetermined conduct emanating from the personality disorder of the individual accused. It is his thesis, at least with respect to homicide, that after study of an accused and his life history, and the circumstances of the crime against a background of that history, his expertise as a psychiatrist and psychoanalyst enables him to decide that the killing was inevitably predestined to occur whenever the individual's functional personality disorder was subjected to the type of stress imposed by the circumstances which at-

tended the act. Thus a killing, though intentional, being predestined rather than premeditated, should impose limited criminal responsibility in deciding whether the deed constituted first or second degree murder or manslaughter.

In applying his expertise to this case he reiterated Sikora understood and could differentiate between right and wrong. Also, ordinarily Sikora was able to conceive a design to kill and to deliberate upon it. In fact he was able to do so until a few hours before the homicide occurred. But, because of his individual type of personality disorder, under the stress of certain circumstances which he feels inadequate to cope with, tensions build up within him and his psychological mechanism moves into action which on the surface may seem planned and deliberate but is really in response to unconscious influences and therefore automatic.

According to Dr. Galen, tensions had been building up in Sikora, particularly since his female friend rejected him. When he was humiliated in the tavern by the remarks about her availability for other men because she had broken with him, and then physically beaten by Hooey and his companions, the tensions mounted to the point where they represented a situation in life with which he felt unable to cope. So he began to act in an automatic way; the manner in which a person with his personality inadequacy would characteristically act. He responded to the stress in the way which inevitably would be his way of dealing with that kind of stress. He reacted automatically in the fashion of Dr. Galen's physician friend when he was cut off by another motorist. His successive actions, walking home from the tavern, reporting the assault upon him to the police, deciding against a criminal complaint, obtaining his gun from its place of concealment in the apartment, putting the extra bullets in his pocket, writing the note that the first bullet was for Doug and the second for Stella Miller, contemplating suicide, test-firing the gun, rejecting the idea of suicide, reloading the gun on the stairway of his apartment while thinking about Hooey and the beating in the tavern, walking to the tavern

to "talk" to Hooey, deciding to use the alley entrance in an effort to draw Hooey out that way, and putting four bullets into Hooey after backing some distance from the tavern while warning him not to come closer and advising him he was "liable" to find out the gun would fire if he came closer, and then walking to the Miller woman's apartment still carrying the gun and searching for her, all showed strong elements of automatism. The beating administered by Hooey in the tavern precipitated the disorganization of his personality to the extent that from then on he probably "acted in at least a semi-automatic way, and probably an automatic way."

The doctor went on to say that from the defendant's course of conduct it could be seen that he was acting in an automatic way "rather than being totally aware of his environment, and the situation * * *." Although the state was not completely an automatic one there were "strong elements of automatism" present. He was not "fully conscious of his activities" and not "completely aware" of what he was doing. The stress to which he had been subjected had distorted his personality mechanism. His personality disorder, the kind of man life had made him, when subjected to that stress prevented him from "seeing reality, or premeditating or forming a rational opinion of what is going on in his life." He had been confronted with a situation and reacted with conduct which was his characteristic way of dealing with the particular kind of stress. As the doctor put it in answer to defense counsel's question:

"You may react to someone cutting you off on the highway in a different way than the Prosecutor may. It has to do with your personality. It has to do with your way of dealing with this kind of stress."

In short the doctor opined that the circumstances to which Sikora had been subjected imposed on his personality disorder a stress that impaired or removed his ability consciously to premeditate or weigh a design to kill. The tension was so great that he could handle it only by an automatic reaction

motivated by the predetermined influence of his unconscious. Plainly the doctor meant that Sikora's response was not a voluntary exercise of his free will. The stress was such as to distort his mechanisms. During the various actions Sikora took leading up to the killing, which so clearly indicate conception, deliberation and execution of a plan to kill, he was thinking but the thinking was automatic; it was simply subconscious thinking or reaction; it was not conscious thinking. The doctor said Sikora's anxieties at the time were of such a nature that conceivably, his reaction in that automatic way and the commission of the homicide, actually prevented a further disorganization of his personality. The killing, said the doctor, was "a rational murder" but "everything this man did was irrational," and engaged in when he could not conceive the design to kill. (The doctor's testimony in this case might be contrasted with that given by him in *State v. Guido*, 40 *N. J.* 191, 203 (1963), where he said the defendant was temporarily insane not because of a psychosis but by virtue of "the ascendancy of the unconscious drives which rendered her, in a legal sense, temporarily insane.")

The question now presented is whether psychiatric evidence of the nature described is admissible in first degree murder cases on the issue of premeditation. Defendant argues that it should have been received at the trial on that issue. In doing so principal reliance is placed on *People v. Gorshen*, 51 *Cal. 2d* 716, 336 *P. 2d* 492 (*Sup. Ct.* 1959), and *People v. Henderson*, 60 *Cal. 2d* 482, 35 *Cal. Rptr.* 77, 386 *P. 2d* 677 (*Sup. Ct.* 1963), on a general statement of this Court in *State v. DiPaolo*, 34 *N. J.* 279, *cert.* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed. 2d* 80 (1961), and on certain medical texts and articles in medical and law journals.

In *DiPaolo* the Chief Justice said that evidence of "any defect, deficiency, trait, condition, or illness which rationally bears upon the question" whether the accused did in fact premeditate is admissible in a first degree murder trial. 34 *N. J.*, at *p.* 295. But he indicated also that if such evidence was unreliable or too speculative or incompetent when

tested by concepts established in law for the determination of criminal responsibility, it should not be received on the issue of guilt or innocence or the degree thereof. That is the situation here. Under the *M'Naghten* concept, from which New Jersey has declined to depart (*State v. Lucas*, 30 *N. J.* 37, 72 (1959)), he who has the mental capacity to know the difference between right and wrong is legally responsible for his criminal conduct. For protection of society the law accepts the thesis that all men are invested with free will and capable of choosing between right and wrong. In the present state of scientific knowledge that thesis cannot be put aside in the administration of the criminal law. Criminal blameworthiness cannot be judged on a basis that negates free will and excuses the offense, wholly or partially, on opinion evidence that the offender's psychological processes or mechanisms were such that even though he knew right from wrong he was predetermined to act the way he did at that time because of unconscious influences set in motion by the emotional stresses then confronting him. In a world of reality such persons must be held responsible for their behavior.

Trite as it may sound to some, the law must distinguish between mental disease and character deformity. Critics of the *M'Naghten* rule of criminal responsibility fail or refuse to realize that its function is not merely to determine which individuals are suffering from mental disorder but also to select those of the mentally disabled whose punishment will aid and protect society because they are able to make rational choices between right and wrong.

██ Criminal responsibility must be judged at the level of the conscious. If a person thinks, plans and executes the plan at that level, the criminality of his act cannot be denied, wholly or partially, because although he did not realize it, his conscious was influenced to think, to plan and to execute the plan by unconscious influences which were the product of his genes and his lifelong environment. So in the present case, criminal guilt cannot be denied or confined to second degree murder (when the killing was a "rational murder" and the

product of thought and action), because Sikora was unaware that his decisions and conduct were mechanistically directed by unconscious influences bound to result from the tensions to which he was subjected at the time. If the law were to accept such a medical doctrine as a basis for a finding of second rather than first degree murder, the legal doctrine of *mens rea* would all but disappear from the law. Applying Dr. Galen's theory to crimes requiring specific intent to commit, such as robbery, larceny, rape, etc., it is difficult to imagine an individual who perpetrated the deed as having the mental capacity in the criminal law sense to conceive the intent to commit it. Criminal responsibility, as society now knows it, would vanish from the scene, and some other basis for dealing with the offender would have to be found. At bottom, this would appear to be the ultimate aim of the psychodynamic psychiatrists. See Diamond, "Criminal Responsibility of the Mentally Ill," 14 *Stan. L. Rev.* 59, 82–84 (1961).

As noted above, defendant argues that the California cases of *People v. Gorshen, supra,* and *People v. Henderson, supra,* support his position. The thesis of those cases is expressed simply in *Henderson* as follows:

"Under the Wells-Gorshen rule of diminished responsibility even though a defendant be legally sane according to the M'Naghton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree." 35 *Cal Rptr.*, at 386 *P. 2d,* at *p.* 682

And the issue dealt with was whether, in light of defendant's mental disorder, he did or did not act in committing the homicide with the specific intent necessary to constitute first degree murder. *Cf. People v. Wells,* 33 *Cal. 2d* 330, 202 *P. 2d* 53, 66 (*Sup. Ct.* 1949), *cert.* denied 338 *U. S.* 836, 70 *S. Ct.* 43, 94 *L. Ed.* 510 (1949). Except for use of the term "diminished responsibility," the statement of the basic principle involved does not differ from that enunciated in *State v. DiPaolo, supra.* But we do not take the California cases to

signify that evidence of a subjective mental disorder of the type suggested in the matter before us would be admissible to show that he did not have the requisite type of intent necessary to establish guilt of first degree murder. Irrespective of the scope of those cases, however, for purposes of administration of the criminal law in this State, we cannot accept a thesis that responsibility in law for a criminal act perpetrated by a legally sane defendant, can be considered nonexistent or measured by the punishment established for a crime of lower degree, because his act was motivated by subconscious influences of which he was not aware, and which stemmed inevitably from his individual personality structure. *Cf. Fisher v. United States*, 328 *U. S.* 463, 467, 470, 473, 66 *S. Ct.* 1318, 90 *L. Ed.* 1382 (1946). A criminal act of that nature is nothing more than the consequence of an impulse that was not resisted.

 In first degree murder cases psychiatric testimony of the type adduced here should be admitted but its probative function limited to the area of sentence or punishment. As we held in *State v. Mount*, 30 *N. J.* 195, 218 (1959), the full psychiatric picture of the defendant, unrestrained by the *M'Naghten* concept, may be shown to aid the jury if it finds guilt of murder in the first degree, in deciding whether the penalty should be death or life imprisonment. If the psychodynamic psychiatric testimony persuasively reveals a personality dysfunction on the part of the defendant, the common sense of the jury can be counted on to assess the matter of limited or diminished criminal responsibility. It is within their province to accept it as a showing of mitigating circumstances which in fairness and mercy ought to reduce the degree of moral culpability. See *Model Penal Code, Tentative Draft No.* 4, § 4.02(2) ; comments *p.* 193 (1955).

In the prosecution of accused for noncapital crimes similar use should be made of the type of medical opinion relied upon here. Under our present system, such psychiatric testimony properly serves a post-conviction purpose. It may be included in the pre-sentence probation report or submitted to the sen-

tencing judge in any other suitable fashion. If in his judgment and discretion it reveals limited criminal blameworthiness, such fact may be reflected in the sentence.

■■ To come back to the specific problem in this case: As we have indicated, Dr. Galen's testimony should have been admitted at the trial, and submitted to the jury for consideration solely on the issue of punishment—life imprisonment or death. But the error cannot be deemed prejudicial. The jury did in fact recommend life imprisonment as part of its verdict, and that sentence was imposed. Under the circumstances, there is no basis for a new trial and accordingly the judgment of conviction is affirmed.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice FRANCIS.

The trial court should have permitted Dr. Galen to answer the question whether defendant was capable of premeditating murder. Although Dr. Galen had already said defendant appreciated the nature of his murderous act and knew it was wrong and hence was not legally insane, still anything the witness could add in response to that particular question would be relevant upon the issue of punishment, for the question whether the death sentence should be imposed calls for a moral judgment with respect to which the law sets no standard. As to that issue the jury may consider whatever medicine or psychiatry can contribute to an understanding of a defendant's behavior. *State v. Mount*, 30 *N. J.* 195 (1959); *State v. DiPaolo*, 34 *N. J.* 279, 291, *cert.* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). Since, however, the jury did recommend life imprisonment, defendant was not prejudiced in this regard.

On the surface of things, the question put to Dr. Galen was relevant also upon the issue of the degree of murder. Again it is of no moment that a defendant was legally sane at the time of the homicide, for his psychiatric make-up may bear upon whether he did *in fact* perform all the mental operations which must be shown to raise murder in the second degree to

murder in the first degree. *State v. DiPaolo, supra,* 34 *N. J.,* at *p.* 294; *State v. Trantino,* 44 *N. J.* 358 (1965). Dr. Galen was permitted to describe Sikora's psychiatric nature and the jury was able to consider it upon that issue. We know now that the doctor's further testimony would not have assisted the jury upon that issue, but no one could know from the question itself that the answer would be incompetent. /

In any event a defendant should be permitted to spread his offer of proof on the record (in the absence of the jury, of course) to the end that an appellate court may see whether there was prejudicial error. *State v. Abbott,* 36 *N. J.* 63, 77–78 (1961). Unless that course is followed, an appellate court may have to reverse a conviction because it has no way of knowing whether harm was done or be obliged to follow the unusual course we took in this case, of having the proffer made under oath during the appeal, a procedure which consumes time and money and may leave one in doubt as to whether the post-conviction offer really matches what was in mind at the time of trial.

As I have said, the question put to Dr. Galen was proper on the surface of things, but the answer we now have reveals his testimony would be incompetent as to guilt for the reason that it does not bear upon the issues as the law conceives them. Rather it simply challenges the law's entire concept of criminal responsibility.

To put the subject in perspective, we must start with the common law's conception of crime. The common law required (1) an evil deed and (2) *mens rea*—a guilty mind. This conception emerged from man's then understanding of himself. It was felt to be unjust to stigmatize a man a criminal unless his evil deed was accompanied by an evil-meaning mind. Insanity was relevant only insofar as it denied the existence of an evil intent and thus disputed that critical element of the State's charge. It was assumed that all men were able to adhere to the right if they saw the right, and hence insanity was conceived to be such disease of the mind as prevented the accused from understanding the nature of

his act and that it was wrong. The law thus separated the sick from the bad upon the basis of a man's capacity to know what was right. Any other imperfection or defect was deemed to be merely a bad trait of character or personality.

The law's conception, resting as it does upon an undemonstrable view of man, is of course vulnerable. But those who attack it cannot offer a view which is demonstrably more authentic. They can tear down the edifice but have nothing better to replace it.

The psychiatric view advanced by Dr. Galen seems quite scientific. It rests upon the elementary concept of cause and effect. The individual is deemed the product of many causes. As a matter of historical fact, he was not the author of any of the formative forces, nor of his capacity or lack of capacity to deal with them. In short, so far as we know, no man is his own maker. I say so far as we know, for man has yet to catch a glimpse of the ultimate truth. The concept of cause-and-effect, satisfying though it may be for most matters, is a dead-end approach to the mystery of our being.

Actually this psychiatric view of man is not new. It was centuries ago that an Englishman, seeing another taken to the place of execution, said of himself, "But for the grace of God there goes John Bradford." Wordsworth knew "The child is father of the man." What the psychiatrist has added is the detailed psychodynamics beneath an individual's objective behavior.

Abstractly, the cause-and-effect thesis could suggest a stultifying determinism whereunder every stroke of a man's pen was ordained when time first stirred. But the psychiatrist, awed by it all, wisely leaves that subject to the philosopher. Besides it is not easy for an inquiring mind to believe it is on a string stretching from infinity. Nonetheless the cause-and-effect thesis dominates the psychiatrist's view of his patient. He traces a man's every deed to some cause truly beyond the actor's own making, and says that although the man was aware of his action, he was unaware of assembled forces in

his unconscious which decided his course. Thus the conscious is a puppet, and the unconscious the puppeteer.

And so, Dr. Galen, in expounding the psychodynamics of Sikora's murderous exploit, started with the premise that Sikora appreciated the nature of his act and knew it was wrong; that Sikora was aware of the events which indeed he recalled with great detail, but was unaware that his unconscious was so constituted that its reaction to his conscious experience had to be homicidal. The doctor added, as I understand him, that the unconscious probably decided on murder in order to avoid a complete disintegration of the personality.

Now this is interesting, and I will not quarrel with any of it. But the question is whether it has anything to do with the crime of murder. I think it does not.

The witness described Sikora's actions as wholly "automatic." While at times he spoke in other terms, such as that Sikora was really not "fully" conscious of what he was doing despite his "long * * * and rather clear history of what occurred," and although on cross-examination the doctor found himself differentiating between rational and irrational ways of committing murder (a most unscientific discourse, it seems to me), his professional theme remained that the conscious was the unwitting and unsuspecting puppet of the unconscious.

Further, "disease" has nothing to do with this automatic behavior. Although in obeisance to *M'Naghlen* the witness said his "diagnosis" of a "personality disorder of a passive dependent type with aggressive features" describes "a mental disorder" listed in the Manual of the American Psychiatric Association, he denied the reality of such classifications. Rather he said mental disturbances or disorders are merely gradients in the range from "essentially normal" to "marked disturbance of the thinking mechanism." The point I stress is that the automatic thesis in nowise depends upon the existence of some "disorder" of the mind. Rather it accounts for all human behavior, whether it be a murder or the retaliatory action of the witness's doctor friend who cut off a motorist

who had cut him off, or the raising of one's index finger rather than his pinky, to refer to still another example Dr. Galen gave of the dictatorial control of the unconscious.[1]

Under this psychiatric concept no man could be convicted of anything if the law were to accept the impulses of the unconscious as an excuse for conscious misbehavior. Although the specific question put to Dr. Galen was whether the defendant was capable of premeditating the murder, his answer would have to be the same if he were asked whether defendant was able to form an intent to do grievous bodily harm or any harm at all. His answer would have to be that the unconscious directed the killing in response to the stimulus of the events preceding the killing. The same explanation would account for the misbehavior of Dr. Galen's motoring friend if he were charged with a violation of the motor vehicle act.

What then shall we do with our fellow automaton whose unconscious directs such antisocial deeds? For one thing, we could say it makes no difference. We could say that in punishing an evil deed accompanied by an evil-meaning mind, the law is concerned only with the existence of a will to do the evil act and it does not matter precisely where within the mind the evil drive resides.

Or we could modify the law's concept of *mens rea* to require an evil-meaning unconscious. The possibilities here are rich. It would be quite a thing to identify the unconscious drive and then decide whether it is evil for the purpose of criminal liability. For example, if we somehow were satisfied that a man murdered another as an alternative to an unconscious demand for suicide or because the unconscious believed it had to kill to avoid a full-blown psychosis, shall we say there was or was not a good defense? Shall we indict for

---

[1] This automaton concept apparently differs from the "irresistible impulse" concept in that it proclaims the conscious is subservient to the unconscious in illness or in health, whereas the irresistible-impulse concept attempts to distinguish between impulses which were not resisted and impulses which could not be resisted because of mental illness.

murder a motorist who kills another because, although objectively he was negligent at the worst, the psychoanalyst assures us that the conscious man acted automatically to fulfill an unconscious desire for self-destruction? All of this is fascinating but much too frothy to support a structure of criminal law.

Finally, we could amend our concept of criminal responsibility by eliminating the requirement of an evil-meaning mind. That is the true thrust of this psychiatric view of human behavior, for while our criminal law seeks to punish only those who act with a sense of wrongdoing and hence excuses those who because of sickness were bereft of that awareness, the psychiatrist rejects a distinction between the sick and the bad. To him no one is personally blameworthy for his make-up or for his acts. To him the law's distinction between a defect of the mind and a defect of character is an absurd invention. Hence, as I tried to say in a concurring opinion in *State v. Lucas*, 30 *N. J.* 37, 82 (1959), and elsewhere, "Criminal Responsibility: Psychiatry Alone Cannot Determine It," 49 *A. B. A. J.* 1075 (1963), the psychiatric conception of man would lead the law to discard insanity as a defense and to think of *mens rea* as nothing more than a conscious intent, objectively-found, to do the forbidden act.[2]

The subject of criminal blameworthiness is so obscure that there is an understandable disposition to let anything in for whatever use the jury may wish to make of it. But it will not do merely to receive testimony upon the automaton thesis, for the jury must be told what its legal effect may be. Specifically, the jury must be told whether a man is chargeable with his unconscious drives.

It seems clear to me that the psychiatric view expounded by Dr. Galen is simply irreconcilable with the basic thesis of our criminal law, for while the law requires proof of an evil-

---

[2] Upon that approach the law would look to psychiatry, not for help upon the issue of guilt, as to which psychiatry is inherently indifferent, but rather upon the problem of post-conviction disposition or treatment of the offender, as to which psychiatry may be useful.

meaning mind, this psychiatric thesis denies there is any such thing.[3] To grant a role in our existing structure to the theme that the conscious is just the innocent puppet of a non-culpable unconscious is to make a mishmash of the criminal law, permitting—indeed requiring—each trier of the facts to choose between the automaton thesis and the law's existing concept of criminal accountability. It would be absurd to decide criminal blameworthiness upon a psychiatric thesis which can find no basis for personal blame. So long as we adhere to criminal blameworthiness, *mens rea* must be sought and decided at the level of conscious behavior.

*For affirmance* — Chief Justice WEINTRAUB and Justices FRANCIS, HALL and HANEMAN—4.

*For reversal*—Justices JACOBS, PROCTOR and SCHETTINO —3.

---

[3] On cross-examination Dr. Galen testified:

• "Q. Is your opinion, Doctor, that in a case such as this, and now referring to the Defendant, Sikora, as to what he did and what happened, that there was a total absence of evil on the part of this Defendant at the time that this act was committed? A. Mr. Donatelli, I am a Doctor. I am a Psychiatrist, and you are asking me to discuss, really, a philosophical concept which is the concept of evil.

Q. Well, basically, isn't that what you have been doing, Doctor, a philosophical— A. No. I have not been doing a philosophical, dealing with this on a philosophical basis. I have been trying to deal with this on a medical, and hopefully a scientific basis in which I have tried to show that Psychiatrists do have a knowledge of the way people operate, that they do have a knowledge of stress and the way people react to particular kinds of stress, based on their personality disorganization. In terms of evil, you are asking me, I feel somewhat medieval about talking about evil. I don't think it is particularly a Psychiatrist's place to discuss evil in our Society."