THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. CARMINE DiPAOLO, Jr., DEFENDANT-APPELLANT.

Argued December 20, 1960—Decided March 6, 1961.

*Mr. Salvatore J. Vuocolo* argued the cause for appellant.

*Mr. Michael R. Imbriani,* Assistant Prosecutor of Somerset County, argued the cause for respondent (*Mr. Arthur S. Meredith,* Somerset County Prosecutor, attorney; *Mr. Michael R. Imbriani,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted of murder in the first degree and sentenced to life imprisonment upon the jury's recommendation. He appeals to this court pursuant to *R. R.* 1:2–1 (c).

Defendant had courted his victim, Gladys Mielnicki. Their relationship was somewhat turbulent. Defendant wanted to marry her but she doubted a marriage could succeed. During a period of a week or so prior to the homicide, defendant told several friends that he would kill decedent, saying if he could not have her, no one would. On the morning of the crime, he left his home carrying a kitchen paring knife. He also had a loaded shotgun in his automobile. He intercepted decedent on her way to work. He entered her car and during a course of travel, to which we will again refer, he inflicted some 40 stab wounds, most of them about the neck. Defendant drove to State Police barracks at Somerville where he revealed his deed. Decedent

was found on the floor of the right front of the car. She was dead when examined. Beneath her body lay the knife. Defendant signed a confession and reenacted the events of the day.

## I.

Defendant challenges the validity of the indictment. He argues there is no proof the crime was committed in Somerset County and hence the grand jury lacked "jurisdiction" of the offense.

Defendant's odyssey began in Middlesex County and terminated in Somerset. The course of travel also penetrated Union County. According to defendant's confession, there were several distinct stabbing episodes. The place of death could not be fixed precisely. The State argues the evidence would justify a finding that decedent died in Somerset County, but no finding was made since the trial court deemed the situation to be controlled by a rule of court to which we shall refer. Hence if defendant's point has validity, the factual issue remains undetermined.

The rule to which we just referred is *R. R.* 3 :6–1 which reads in part:

"(a) Except as otherwise provided herein, the prosecution for a criminal offense shall be had in the county in which the offense was committed.

(b) Where it is uncertain in which one of two or more counties the criminal offense has been committed, prosecution may be had in any of such counties.

(c) Whenever a person shall die in one county as a result of a criminal offense committed in any other county or counties, the prosecution may be had in any of such counties.

(d) Whenever the body of any person who shall have died as a result of a criminal offense is found in any county, prosecution may be had in such county, regardless of where the criminal offense was committed."

The situation is embraced by (b) and (d) above.

Defendant argues the rule is invalid as an infringement of the constitutional right to indictment. *Article* I, *Par.*

VIII, provides that "No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury * * *." Defendant contends that there is an inherent limitation which confines jurisdiction to the grand jury in the county in which the crime was committed. He adds that unless the State can prove the precise place, he is entitled to go free. That result would be absurd, but he says the absurdity is constitutionally entrenched.

Indictment is patently a matter of practice and procedure. *State v. Greco,* 29 *N. J.* 94, 104 (1959). That this is so, does not however end the inquiry. Many of the fundamental guarantees of the Constitution are of that nature, and in our State the right to indictment is one of them. Hence the question is whether the constitutional guarantee of indictment includes some immutable principle of venue. The constitutional provision quoted above being silent as to venue, we must examine the history of the subject to determine whether the claimed limitation is implicitly a part of the guarantee.

The aim of the constitutional guarantee is to protect against arbitrary prosecution by government. The essence of the right is that no man shall be brought to trial for crime unless a grand jury of his peers shall first find sufficient cause for the charge. Although a rule developed at early common law that a prosecution be instituted in the county in which the crime was committed, the reasons seem unrelated to the stated aim of the guarantee. Rather the rule reflected a practice made necessary by circumstances which no longer exist. Communities were scattered and travel difficult. Petit jurors decided causes upon their personal knowledge rather than upon the testimony of witnesses and probably grand jurors as well relied upon what they knew or learned from their neighbors. That the concept of venue was not thought to be an essential attribute of the procedural guarantee is evidenced by the fact that when changing circumstances made the then concept of venue

a fortuitous haven for the guilty, Parliament enacted numerous exceptions to the common law rule and did so long before the separation of the American Colonies. 4 *Blackstone, Commentaries* 303; 1 *Chitty, Criminal Law* 177 (1836); 1 *Stephens, History of the Criminal Law in England* 277 (1883); see also *State v. Wyckoff,* 31 *N. J. L.* 65, 69 (*Sup. Ct.* 1864).

◾ Thus at the time of the adoption of the American constitutions the common law rule of venue had already been modified by legislation designed to meet situations for which the general rule was inadequate or inapt. Moreover, the nature of the subject suggests that room must be left for accommodation with changing needs, so long as there is preserved the promised security from arbitrary charge by officialdom. In the light of both the history and the reason for the guarantee, we cannot fairly assume the Constitution intended to imbed a rule of venue. Decisions elsewhere generally hold that constitutional provisions such as ours do not embody a requirement that indictments be found only in the county in which the crime was committed. The subject is fully discussed in Annotation, 76 *A. L. R.* 1034 (1932) and in Blume, "The Place of Trial of Criminal Cases," 43 *Mich. L. Rev.* 59 (1944). See also *State v. Pace,* 129 *Conn.* 570, 29 *A. 2d* 755 (*Sup. Ct. Err.* 1943). As pointed out in the cited annotation, a contrary result has been reached in jurisdictions where the constitution either expressly requires the indictment to be found in the county of the crime or expressly provides for trial in such county. See also 4 *Wharton, Criminal Law and Procedure* § 1729, *p.* 516 (1957). It is significant that neither provision appears in our Constitution. As we have already noted, our indictment provision (*Art.* I, *Par.* VIII) is silent as to venue, and the provision for trial by jury (*Art.* I, *Par.* X) is also silent with respect to the place of trial. Indeed the Superior Court was granted original jurisdiction throughout the State in *all* causes (*Art.* VI, § III, *par.* 2), and it is the court to which all indictments are returned for trial.

This conclusion is fortified by the fact that our Legislature has dealt with the subject of venue without, so far as we know, any question as to its constitutional authority to do so. See *State v. Wyckoff, supra* (31 *N. J. L.,* at *p.* 69); *State v. James,* 96 *N. J. L.* 132, 148 (*E. & A.* 1921); *R. S.* 2:184–1 to 6; *L.* 1944, *c.* 198, § 1, *p.* 715, *N. J. S. A.* 2:184–2.1.

Hence we are satisfied that the Constitution does not embody the common law rule of venue. This leads to the final question whether this court may deal with venue under its constitutional authority to "make rules governing * * *, subject to law, the practice and procedure in all such courts." (*Art.* VI, § II, *par.* 3.) As we have said, the subject of indictment and the incidental matter of venue plainly fall within the area of practice and procedure. We add that the Legislature entertained the same view when, in enacting *Title* 2A by *L.* 1951, 1*st Sp. Sess., c.* 344, it deliberately omitted to reenact the venue provisions of *Title* 2 as well as other provisions relating to indictment (*R. S.* 2:184–1 to 6; 2:188–1 to 26), to the end that the Supreme Court could deal with the subject under its rule-making power. *State v. Haines,* 18 *N. J.* 550, 558 (1955).

It is argued that unless some constitutional restraint is found, the Legislature or the Court could authorize a grand jury sitting in one county to attend to all of the criminal business in another. We need not now consider whether some limitation in that regard may be found in organic law. Surely the question is not suggested by a rule which permits indictment and trial in a county where the accused deposited the body of his victim. The situation hypothesized in the argument is likely to remain but hypothetical and so we should leave it.

We should discuss the method whereby defendant sought to raise the issue of venue. He moved for a dismissal at the close of the State's case. Proper practice required a motion before trial. We so held in *State v. Greco, supra* (29 *N. J.,* at *p.* 104). As there pointed out, *R. R.*

3 :5–5 (b) (2) provides that "Defenses and objections based on defects in the institution of the prosecution or in the indictment or accusation other than that it fails to show jurisdiction in the court or to charge an offense must be raised by motion before trial" and that "Failure so to present any such defense or objection constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver." The homicide was committed within the State of New Jersey. Crimes are offenses against the State rather than a territorial subdivision of it. As we have said, the Superior Court has "original general jurisdiction throughout the State in all causes." *Const. of* 1947, *Art.* VI, § III, *par.* 2. The grand jury is an arm of that court and returns all indictments to it. *R. R.* 3 :3–8(a) ; *R. R.* 3 :4–1(b). An indictment may be tried in the Superior Court or be assigned by the assignment judge to the county court for disposition. *R. R.* 3 :4–1(a). Hence, if it appears the offense was committed within the State, there is no issue as to "jurisdiction in the court" within the meaning of the rule. Rather improper venue under *R. R.* 3 :6–1 is a defect in the institution of the prosecution. That question is not to be litigated upon the trial of the indictment. There must be a motion before trial, and indeed before the plea is entered unless the court permits the motion to be made "within a reasonable time thereafter." *R. R.* 3 :5–5(b)(3). This is not to belittle the venue provisions. They embody a significant policy decision, and an accused is entitled to insist upon them. The point is that the authority of a grand jury to act is a subject distinct from the merits of the criminal charge, and a common trial of both issues would be wasteful of time and energy if the defendant's position as to venue should prevail. The pretrial motion is better suited for a fair and expeditious settlement of the preliminary question. There may be cases in which a defendant would be unable to support a motion upon his own knowledge, but on a showing to that effect the trial court may

order a bill of particulars or such other discovery as may be appropriate to permit a pretrial determination of the issue.

We appreciate that when under the *Constitution of* 1844 the grand jury was the arm of a court of county-wide jurisdiction, it was held that at trial the State had to prove the facts necessary to establish venue in the county in which the indictment was found, *State v. Brooks,* 136 *N. J. L.* 577 (*E. & A.* 1948), and also that the requirement was apparently thought to continue thereafter in *State v. O'Shea,* 28 *N. J. Super.* 374, 379 (*App. Div.* 1953), affirmed 16 *N. J.* 1, 4 (1954). But the cited provisions of the present Constitution and the rules to which we have referred lead to the conclusion stated in *Greco.*

## II.

Defendant complains of alleged irregularities (a) in the selection and (b) in the sequestration of the jury.

## A.

A general panel was regularly drawn to serve during the stated session at which this case came on for trial. The general panel consisted of 80 jurors. Pursuant to *N. J. S.* 2A:74–9, a special panel of 48 was drawn from the general panel. The special panel was exhausted before the jury was completed. In such circumstances, *N. J. S.* 2A:74–10 provides that "talesmen shall be taken from the general panel of jurors returned during the stated session at which the defendant is to be tried, *if any remain."* (Emphasis added) Eighteen members of the general panel then remained, and their names were placed in the box. When they were exhausted, the court directed the summoning of additional members "from among the bystanders or others" as directed by the section last cited.

The trial court informed counsel of the course it was pursuing and in response to its question counsel for defendant replied that he had no objection. The complaint now advanced is that there were 14 additional names listed upon

the general panel which were not placed in the box before resort was made to "bystanders and others." There was no objection at the trial, and no record made either then or later to explain the absence of the additional jurors. The record simply indicates they were not available. Apparently we are asked to surmise that they were "available" and then to consider whether there is cause to complain. We cannot find evidence of any irregularity.

## B.

■ Upon a motion for a new trial, a number of events were developed which defendant says violated the rules relating to the sequestration of the jury. It is clear that in connection with all the incidents, there were no communications in any wise relating to the case. Annotation, 22 *A. L. R.* 254, 255 (1923). Emphasis is placed upon the fact that the jurors were taken to a theatre. There was no separation and the theme of the picture was unrelated to the case. Annotation, 33 *A. L. R.* 2d 849 (1954). The jurors were attended by court officers on all occasions except when a priest heard the confessions of two jurors prior to the commencement of the trial. The elapsed time was but a few minutes and no impropriety is even intimated. The jurors had been duly ordered by the trial court not to discuss the matter with anyone. The record negates any possibility of prejudice. We see no basis for reversal.

■ One incident, however, warrants comment. On one occasion the jurors were taken outside the State for dinner. Defendant questions the court's power to enforce its order of sequestration beyond the borders of the State. A sufficient answer is that nothing untoward occurred and hence there is nothing of which defendant can complain. Annotation, 34 *A. L. R.* 1115, 1201 (1925). Nonetheless it was obviously a violation of the court's order to journey beyond the jurisdiction, a violation which we trust will not be repeated.

## III.

Defendant advances a number of issues based upon a claim of insanity.

The testimony reveals two possible motivations. One was that defendant, spurned in his pursuit of decedent, determined that if he could not have her, no one else would. The other, colored by deep religious preoccupation, was that since he and the decedent had engaged in illicit relations, their sin could be expiated only by the destruction of both of them. Defendant testified that God commanded his deed and that at the time of the homicide he heard a "voice" which directed him to kill. Defendant's alleged delusion was very much in dispute. Indeed, while still alone with the body of his victim, defendant wrote a note which could be read to acknowledge that his deed violated the law of God and in which he prayed for divine forgiveness. At any rate, the claimed delusion was the core of his defense of insanity. The expert testimony was in conflict, the evidence for the defendant being that he suffered from schizophrenia and was legally insane whereas the State's experts found no evidence of psychosis or of resulting legal insanity. The issue was for the jury, which by its verdict found defendant sane at the time of the homicide.

## A.

Defendant asks that we again weigh the validity of the *M'Naghten* rule but adds nothing to the considerations before us when we recently decided to retain it in *State v. Lucas*, 30 *N. J.* 37 (1959). We see no reason to depart from *M'Naghten*. Rather, until persuasive evidence of the validity of another concept shall appear, we will continue what we believe to be a fair solution of this difficult subject, by permitting a defendant to offer, with respect to whether the penalty shall be death or life imprisonment, the complete psychiatric picture unrestrained by the *M'Naghten* concept. *State v. Mount*, 30 *N. J.* 195 (1959). Full testimony was

here accepted and upon request the trial court expressly charged that if the jury should find defendant guilty of murder in the first degree, the evidence with respect to mental illness nonetheless remained in the case with respect to punishment. *State v. White,* 27 *N. J.* 158, 180 (1958).

### B.

██ The trial court charged legal insanity in the traditional phrasing of the *M'Naghten* rule. Indeed defendant submitted a request in those terms. Defendant now complains that the court should have defined "defect of reason," "diseased mind," "knowledge," "nature of the act," and "quality of the act." There was no objection to the charge. Nor were any definitions suggested to the trial court. Even now the criticisms are wholly negative. The charge in its classic form seems to be as revealing a statement as one can fashion for the underlying concept, but if clarification is thought to be required by the circumstances of a given case, a specific request should be submitted to the trial court.

We should comment upon defendant's reference to *People v. Schmidt,* 216 *N. Y.* 324, 110 *N. E.* 945, 946, *L. R. A.* 1916D, 519 (*Ct. App.* 1915), although defendant cites that case in another connection. There too the defendant claimed an insane delusion that the voice of God directed him to slay his victim as a sacrifice and atonement. The trial judge charged the statutory definition of legal insanity which embodies the *M'Naghten* test, but in connection with the phrase "not to know that the act was wrong," the trial court defined "wrong" to mean an offense against the laws of the State. The Court of Appeals said there would have been no basis for complaint if the trial court had not undertaken to define "wrong" (110 *N. E.,* at *p.* 949), but found the trial court's exposition was erroneous. Specifically, the amplified charge permitted a finding that the defendant, although suffering from the *insane delusion* we have described, yet was legally sane because he knew the act was forbidden by law. Holding

that "wrong" imports "morally" wrong, the Court distinguished an insane delusion which negates a consciousness of the immorality of the act from a moral depravity or some notion of morality, unrelated to mental illness, which merely disagrees with the law and *mores* of our society. It said (at *pp.* 949–950):

"It is not enough, to relieve from criminal liability, that the prisoner is morally depraved. *Wharton, Criminal Law* (11th Ed.) § 63. It is not enough that he has views of right and wrong at variance with those that find expression in the law. The variance must have its origin in some disease of the mind. *People v. Carlin*, 194 *N. Y.* 448, 455, 87 *N. E.* 805. The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby relieved from responsibility before the law. *Guiteau's Case* (*D. C.*) 10 *Fed.* 161, 175, 177; *Parsons v. State*, 81 *Ala.* 577 at 594, 2 *South.* 854, 60 *Am. Rep.* 192 [193]; *Reynolds v. U. S.*, 98 *U. S.* 145, 25 *L. Ed.* 244; *People ex rel. Hegeman v. Corrigan*, 195 *N. Y.* 1, 13, 87 *N. E.* 792. In such cases the belief, however false according to our own standards, is not the product of disease. Cases will doubtless arise where criminals will take shelter behind a professed belief that their crime was ordained by God, just as this defendant attempted to shelter himself behind that belief. We can safely leave such fabrications to the common sense of juries."

In the present case, the alleged delusion was the hub of the plea of insanity and the defense depended upon the truthfulness of that testimony. The experts disagreed upon whether there was evidence of a psychosis to support the alleged delusion, but none suggested that if defendant in fact suffered an insane delusion that God commanded the deed, he nonetheless was legally sane if he simultaneously appreciated that the deed was contrary to law. Nor did the trial court so intimate. Hence as the case was tried and submitted, the defense would have been accepted if the jury found that at the time of the deed defendant was mentally ill and the illness generated the delusion he claimed.

The charge is also criticized for want of discussion of the expert testimony. No objection was made at the trial.

The point seems to be that the jury might not have understood the testimony and hence the trial judge should have expounded its inner meaning. It is the role of the examiner to elicit testimony in understandable terms, and we add that counsel here succeeded in doing precisely that. There is no suggestion as to what the trial judge should have added, and nothing occurs to us. The matter rested within the trial court's discretion and we see no misuse of it.

## C.

Next defendant contends that evidence of mental illness is competent upon the issue whether the crime was murder in the first degree or murder in the second degree. The court in fact admitted the evidence without restricting it to any single issue, and did not instruct the jury to exclude the evidence in passing upon the degree of the offense. Hence defendant had the benefit of the rule he espouses. Although for that reason the issue is not involved, yet the issue has received uneven treatment in our cases and hence we should resolve it for the future guidance of the bar and trial bench.

The difficulty seems to be that the topic is sometimes explored under the label of "partial responsibility" or "diminished responsibilty" or perhaps confused with some other concept intended to be so described. Both of those characterizations are misleading since they tend to connote an "affirmative" defense designed to defeat a case the State has otherwise established and thus to suggest the intrusion of an amendment to the established basis for criminal accountability. Actually the question is simply whether there shall be excluded evidence which merely denies the existence of facts which the State must prove to establish that the murder was in the first degree.

An unlawful homicide is presumed to be murder in the second degree. The burden is then the State's to prove facts which elevate the offense to murder in the first degree. *State v. Williams*, 29 *N. J.* 27, 44 (1959). *N. J. S.*

2A:113–2 specifies what murders are in the first degree. We are here concerned with the category described as a "willful, deliberate and premeditated killing." The statutory language is actually an inverse statement of the natural sequence of the required mental operations. *State v. Mangano,* 77 *N. J. L.* 544, 546 (*E. & A.* 1909). As settled by judicial construction, the first element is premeditation, which consists of the conception of the design or plan to kill. Next comes deliberation. The statutory word "deliberate" does not here mean "willful" or "intentional" as the word is frequently used in daily parlance. Rather it imports "deliberation" and requires a reconsideration of the design to kill, a weighing of the pros and cons with respect to it. Finally, the word "willful" signifies an intentional execution of the plan to kill which had been conceived and deliberated upon. *State v. Ernst,* 32 *N. J.* 567, 579 (1960); *State v. Mangano, supra* (77 *N. J. L.,* at *p.* 547).

The three mental operations we have just described are matters of *fact*. The judiciary cannot bar evidence which rationally bears upon the factual inquiry the Legislature has ordered. The capacity of an individual to premeditate, to deliberate, or to will to execute a homicidal design, or any deficiency in that capacity, may bear upon the question whether he *in fact* did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did *in fact* occur must be accepted. Such evidence could be excluded only upon the thesis that it is too unreliable for the courtroom, a thesis which would not square with the universal acceptance of medical and lay testimony upon the larger issue whether there was a total lack of criminal responsibility. *Weihofen, Mental Disorders as a Criminal Defense* 176 (1954).

It has long been settled that voluntary intoxication or the voluntary use of drugs may be shown for the jury's consideration with respect to whether a defendant did in fact premeditate, deliberate and willfully kill. *State v. White,*

27 *N. J.* 158, 165–166 (1958); *State v. Wolak,* 26 *N. J.* 464, 477 (1958). The underlying proposition, frequently quoted in our decisions, was stated in *Wilson v. State,* 60 *N. J. L.* 171, 184 (*E. & A.* 1897) in these words:

"When the character and extent of a crime is made by law to depend upon the state and condition of the defendant's mind at the time, and with reference to the act done, intoxication, as a circumstance affecting such state and condition of the mind, is a proper subject for inquiry and consideration by the jury. If, by law, deliberation and premeditation are essential elements of the crime, and by reason of drunkenness *or any other cause* it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not, been committed; there is a failure on the part of the state to prove the crime into which premeditation must enter." (Emphasis added)

We have italicized *"or any other cause."* Surely if voluntary intoxication or use of drugs is evidential with respect to the degree of murder, mental illness or deficiency should be accepted as a legally competent "cause." Yet our decisions seemingly go both ways and were so read by the majority of the United States Supreme Court in *Fisher v. United States,* 328 *U. S.* 463, 473, 66 *S. Ct.* 1318, 90 *L. Ed.* 1382, 1389, 166 *A. L. R.* 1176, 1183 (1946), in footnote 12. See also Keedy, "A Problem of First Degree Murder: Fisher v. United States," 99 *U. Pa. L. Rev.* 267, 275 (1950).

The admissibility of such evidence is supported by *State v. Schilling,* 95 *N. J. L.* 145, 148 (*E. & A.* 1920) and *State v. Close,* 106 *N. J. L.* 321, 324 (*E. & A.* 1930). Cited the other way in the mentioned footnote are *State v. Maioni,* 78 *N. J. L.* 339, 341 (*E. & A.* 1909); *State v. James,* 96 *N. J. L.* 132, 151–152 (*E. & A.* 1921); *State v. Noel,* 102 *N. J. L.* 659, 676 (*E. & A.* 1926), and *State v. Rodia,* 132 *N. J. L.* 199 (*E. & A.* 1944). Perhaps, upon an extended analysis, *Maioni, James* and *Noel* could be reconciled with *Schilling* and *Close.* In any event we read *Rodia* to follow rather than to conflict with *Schilling* and *Close.* In *Rodia* the evidence was received and left with the jury. The court divided 9 to 7 upon the question

whether the trial judge's comment upon the credibility of the proof constituted error, but the majority did not quarrel with the minority upon the admissibility of the evidence.

Five years after *Rodia, State v. Cordasco,* 2 *N. J.* 189 (1949), was decided. In *Cordasco,* the majority opinion said "insanity went only to the question of the guilt or innocence of the accused and could not operate to reduce the degree of murder nor be used in mitigation." (At *p.* 199.) The precise impact of the opinion is debatable. In that case, the trial court had struck the evidence of mental illness when the defense psychiatrist said the defendant was *capable* of premeditation and deliberation on the day of the murder (at *p.* 195). It may be that the majority concluded that the defendant had not offered to prove an impairment of capacity and a connection between that impairment and the issue whether defendant did in fact premeditate and deliberate. It is significant that the majority did not refer to *Schilling, Close* or *Rodia* in this connection. Hence the statement we have quoted above from *Cordasco* should be understood to mean only that insanity as such does not reduce an offense to murder in the second degree, without however denying that the offense remains murder in the second degree if because of illness the mental operations required to raise the degree did not in fact occur.

At any rate we subscribe to the view accepted in *Schilling, Close* and *Rodia.* We are completely satisfied that *any fact* which rationally bears upon the question whether *in fact* an accused did premeditate, did deliberate and did willfully kill must be received. As we have said, the trial judge handled this case in accordance with this view. He accepted all of the evidence and left to the jury the question whether the required mental operation took place upon all the evidence in the case.

D.

The trial court's main charge directed an acquittal if defendant was legally insane at the time of the homicide.

Upon defendant's objection that the charge failed to allow for "temporary" insanity, *State v. Lynch*, 130 *N. J. L.* 253 (*E. & A.* 1943), the trial court, to obviate any doubt, expressly added that legal insanity could be either temporary or permanent in nature. There was no conflict in the instructions. The initial charge did not exclude "temporary" insanity, see *State v. Aeschbach*, 107 *N. J. L.* 433, 437 (*E. & A.* 1931); *State v. Bunk*, 4 *N. J.* 461, 474 (1950), and the supplemental charge made it plain that the mental illness need not be permanent. Indeed the court instructed the jury that if it found defendant was legally insane at the time of the homicide, it must return a verdict of "not guilty" with a finding as to whether the insanity did or did not continue to the time of trial.

 Defendant complains of so much of the charge as discussed "emotional insanity" and "moral insanity." The instructions were given in the customary phraseology. The purpose of course was to differentiate legal insanity from an emotional turbulence or a defective or perverted moral sense which did not spring from mental illness. *State v. Aeschbach, supra* (107 *N. J. L.,* at *p.* 436). We find no error.

E.

Defendant contends the court should have submitted to the jury the issue of involuntary and voluntary manslaughter. The subject of involuntary manslaughter was not raised below. Defendant requested an instruction that he must be acquitted unless the jury found he inflicted the fatal wound. The court so charged, not because the evidence suggested any doubt but simply because a verdict cannot be directed against a defendant in a criminal case. Defendant now argues that even though the jury found he was the assailant, yet it might have found that decedent fell upon the knife and thus accidentally suffered the fatal wound, thereby inviting the question whether he was guilty of involuntary manslaughter. The factual suggestion is pre-

posterous. There was no evidence whatever to support it. The single fact alluded to is that the weapon was found on the floor of the car beneath the decedent's body.

As to voluntary manslaughter, there was no "provocation" for the attack within the accepted definition of the term. *State v. Wynn,* 21 *N. J.* 264, 270 (1956). Conceding this, defendant nonetheless argues that since malice differentiates murder from manslaughter, *State v. Williams, supra* (29 *N. J.,* at *p.* 36), the testimony that God directed him to kill and that he believed decedent must be destroyed to expiate their sin, is sufficient to negate the malice which otherwise plainly appeared from the unprovoked attack with a deadly weapon.

It is not clear whether the proposition postulates a sane or an insane man. If sanity is assumed, the answer appears in the quotation hereinabove from *People v. Schmidt, supra* (110 *N. E.,* at *p.* 949). If the proposition assumes legal insanity, then, as we have already said, the delusion was part and parcel of the defense and would have led to an acquittal. An instruction that in such circumstances the crime of manslaughter could be found would have been prejudicially erroneous if a verdict of manslaughter had been returned.

## IV.

Defendant asserts a number of other errors. We find no substance in any of them. Nothing would be gained by a detailed discussion. The issues raised are fully covered by prior decisions of this court.

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For reversal*—None.