161 N.J. Super. 424 (1978)
391 A.2d 1225
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THEODORE MOLNAR, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 1978.
Decided July 18, 1978.
*431 Before Judges ALLCORN, MORGAN and HORN.
Mr. Michael J. Herbert, assigned counsel, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Robert E. Rochford, Deputy Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by MORGAN, J.A.D.
Conviction by jury of two counts of perjury (N.J.S.A. 2A:131-1) and one count of misconduct in office (N.J.S.A. 2A:85-1), defendant appeals, contending that (1) entrapment was established as a matter of law or, at least, should have been submitted to the jury as a factual issue; (2) trial court error occurred when the trial judge instructed the jury that defendant bore the burden of *432 proving amnesia; (3) the trial judge improperly delimited the scope of expert testimony; (4) defendant's motion to adduce evidence of the result of a polygraph test should have been granted, and (5) the jury instructions improperly omitted reference to the necessity that defendant's allegedly perjured grand jury testimony be material.
The charges against defendant stemmed from an investigation by the Mercer County grand jury into allegations by an escaped inmate that, while incarcerated in the Mercer County Workhouse, he paid $1500 to obtain a favorable work assignment. Defendant, warden of the workhouse, was subsequently indicted for perjury and misconduct in office for having failed to report a telephone conversation with the escaped prisoner in which the fact of the bribe was allegedly made known and for swearing to the grand jury that no such telephone conversation ever occurred.
The sequence of events pertinent to the issues raised on this appeal commences with the 12-month incarceration of one Angelo ("Doc") Migliaccio in the workhouse following guilty pleas to a number of gambling charges. Initially, Migliaccio was assigned to work in the officers' dining room. Later, he was reassigned to an "outside" detail in the hothouse, an assignment Migliaccio apparently viewed as more to his liking. The hothouse work entailed outside work, cutting grass and caring for flowers, and was considered beneficial to his precarious health. Migliaccio was no longer young and had previously suffered from coronary problems.
This assignment terminated, however, when Migliaccio and two other inmates violated workhouse regulations by wandering into a forbidden portion of the institutional grounds. All three were reprimanded, and Migliaccio was deprived of his favorable hothouse assignment in favor of an assignment to labor as a "runner," a job entailing indoor work on a variety of tasks, including handling of institutional linen and general custodial chores.
Finding this new assignment more physically onerous than his previous one, Migliaccio consulted with a fellow *433 inmate, Richard Storcella, also serving time for gambling offenses, and a long time friend and occasional criminal associate of Migliaccio. Storcella's work assignment in the administration building for the institution gave him access to the warden's office. Migliaccio importuned Storcella to aid him in obtaining reassignment to the hothouse and offered him money for his efforts. Storcella agreed that for a payment of $1500 he would do what he could.
Pursuant to this agreement, $1500 in two checks, $1,000 and $500, was delivered by Migliaccio's wife to Storcella's wife, and thereafter Storcella spoke with defendant in the latter's office. He told defendant of Migliaccio's desire for reassignment to the hothouse detail and that if he was reassigned, there would be "$1000 in it for you [defendant]." It is undisputed that defendant flatly rejected the money offer and threw Storcella out of his office, saying "Get out of here. I don't want to know nothing about money. I will do what I could for the best interest of the inmate." Storcella never discussed the matter again with defendant.
Not content with this response, Storcella next spoke with Michael Loffredo, an experienced guard at the workhouse and a friend of defendant. Apparently, Loffredo had been acquainted with both Storcella and Migliaccio before their incarceration. Storcella advised Loffredo of Migliaccio's desire for reassignment to the hothouse and of his willingness to pay for it. They agreed that the $1500 paid by Migliaccio would be split up, with $700 going to Loffredo; Storcella would retain the remaining $800. Pursuant to the agreement, Loffredo spoke with defendant, explaining Migliaccio's desire for reassignment to the hothouse and, as a special favor to him, Loffredo, asked that the request be honored. Defendant's response was that he would do what he could to effectuate the reassignment. A few days later, on June 12, 1973, Angelo Migliaccio was reassigned to the hothouse work detail. Loffredo received the agreed $700 in two checks, one for $500 and the other for $200.
*434 While defendant was out on extended sick leave in Florida commencing June 14, 1973, Migliaccio escaped from the workhouse on July 1, 1973 by walking away from his minimum security job. On defendant's return to New Jersey during the early part of July 1973 he met Loffredo in a Trenton bar, during which meeting defendant's health and the health of his father were the topics under discussion. While in the rest room Loffredo thrust at defendant a unit of paper currency. When defendant initially rejected it, Loffredo placed the money in defendant's pocket. Subsequently, defendant found a $100 bill and thought that it was in repayment of an $80 debt Loffredo owed him.
Following his escape from the workhouse Migliaccio became suspicious of the good faith of Storcella and Loffredo; specifically, he doubted that any part of the $1500 payment was used as a bribe to secure his reassignment to the hothouse detail. Accordingly, while Migliaccio was a fugitive, he and his wife met with the Mercer County Prosecutor's office in October 1973 where information concerning official misconduct at the workhouse was disclosed. Both agreed to assist the Prosecutor's office in investigating Migliaccio's allegations of corruption.
Pursuant to this agreement, Migliaccio met with Richard Hutchinson, an investigator in the Mercer County Prosecutor's employ, at the latter's home on November 21, 1973, for the purpose of placing a call to defendant of which a tape recording would be made. Hutchinson obtained defendant's unlisted number, dialed it, and when he heard a voice, handed the phone to Migliaccio.[1] The recording of the entire conversation, together with its transcription, was admitted into evidence over defendant's objection.
*435 Because this conversation is the central fact about which the remainder of the case revolves, some mention ought to be made of its curious contents. First, Migliaccio, an escaped inmate at the time, did not establish his identity at the outset of the conversation.[2] Indeed, the call commenced with Migliaccio addressing defendant by the latter's first name, "Ted", and immediately thereafter asking him whether Mike Loffredo was there, almost as if such calls, between escaped inmate and warden, were a daily occurrence and "Ted" would know who was calling. This is followed by an inquiry into "Ted's" health, evidencing Migliaccio's knowledge of defendant's auto accident. At no point in the first three pages of the transcription of his conversation does Migliaccio identify himself; and defendant neither asks for his caller's identity nor addressed him by name. And it is during this three-page portion of the conversation that Migliaccio makes somewhat cryptic references to the corruption which was the underlying purpose of the call.
The subject is opened in the following manner:
Angelo: One thing's bothering me. The only thing I wantta get straightened out Ted. See, because I helped Storky [Storcella] a lot. I don't know if Mike told ya. Did Mike tell ya?
Ted: No.
Angelo: I helped him while he was up there before I came up. Ya know?
Ted: Yeah.
Angelo: And he didn't pay that back. In other words, ah-ah- Mike gave him the thing you know to put food in the store.
Ted: Ugh ugh.
Angelo: And ah  and while I was out, I gave his wife money to put food in his store.[3] Do ya follow what I mean?
Ted: Yeah  I get ya.
Angelo: Only one thing I wanna know, Ted. I want the honest truth. And  because I gave you my  I gave my word. See, I gave him the fifteen hundred.
*436 Ted: Hmm Hmm.
Angelo: Mike, I guess Mike told ya he got the five hundred right?
Ted: That who  ah  who did?
Angelo: Mike got  got.
Ted: No. He didn't tell me much of anything.
Angelo: Well, anyway. Did you get your right amount?
Ted: Um  ah  h  h 
Angelo: The thousand?
Ted: No. I didn't get a thing.
Angelo: You didn't get a nickel?
At this point defendant told his caller that on one occasion Mike gave him a hundred dollars. "He put it in my pocket. Then I couldn't talk to him what it's for. Or anything  ." Later on in the conversation, defendant again stated that Loffredo put the money in his pocket, "and then I was questioning him. I even backed away from him. I didn't know what the hell he was doing. I didn't see (inaudible)."
It was at this point in the conversation that Migliaccio advised defendant of his intention to give himself up:
Angelo: Well, wait a minute. Here's the point, cause see, it's  cause I want to give myself up and I figured  I  I  gave him  I gave Mike my word that I wantta do the right thing. You understand?
Ted: Yeah.
Only then did defendant address Migliaccio by his name, thus giving the first indication that he was aware of his caller's identity.
Nowhere in the conversation, however, did Migliaccio refer to money given by him for work detail reassignment or indeed for the granting of any official favors. If one were to conclude that defendant knew about Migliaccio's arrangement with Storcella, perhaps from defendant's prior conversation with Storcella at least four months before, the information given would have significance as bearing on corruption. In the absence of such knowledge, derived from associating Migliaccio's call with Storcella's prior visit, *437 Migliaccio's reference to money lacked all connection to a significant context. In any event, nothing in defendant's response suggests that he knew of the arrangement.
Much of the later portions of the conversation, those occurring after defendant addressed his caller by name, evidenced Migliaccio's apparent concern over his treatment on return to prison and defendant's assurance that "I won't hold nothing against you, Doc."
Angelo: Oh, but see now the thing is this. So, I said to myself, now if Storky got the rest, then he double-crossed me and he  and ah everything. See?
Ted: Yeah.
Angelo: I figured when I come back, you was gonna hold that against me.
Ted: No. Well, I didn't even known [sic] nothing about it. I won't hold nothing against ya.
Angelo: Well, in other words  in other words, he only gave you a hundred dollars.
Ted: Yeah, ah  look, my ride is pulling up now.
Angelo: All right, well, anyway, all right, Ted  well, I don't want ya to hold nothing against me. * * *
We have dwelt at considerable length on the contents of this conversation because of the pivotal role it played in the charges made against defendant. Defendant's later sworn testimony before a grand jury investigating Migliaccio's allegations of corruption denying that he had received this call grounded the perjury charges; his failure to report to law enforcement authorities the contents of this call revealing the corruption of at least one of the prison officers provided the basis for the misconduct in office charges of which defendant was convicted.
The course of events which followed the phone call recounted above includes a visit by Hutchinson to defendant at the latter's office on January 18, 1974, and their conversation during that visit which was also secretly recorded. Critical to that conversation was defendant's denial of having heard from Migliaccio after his escape from the workhouse. In addition, *438 defendant denied that he either received bribe monies or heard that others had received any. After Hutchinson specifically mentioned the possibility that Migliaccio had paid a bribe for his reassignment to the hothouse, defendant responded that he had only heard rumors of it. Defendant denied that Angelo Migliaccio ever telephoned him.
In answer to a subpoena defendant appeared before the Mercer County grand jury on January 30 and February 6, 1974 and was warned that he was a target of their investigation. Under oath, and provided with immunity, defendant denied ever having received information that Migliaccio might have paid money to obtain reassignment to his former job or any information that any officer at the workhouse might have received money from inmates in the previous two years. As pertinent to the perjury charge, defendant denied speaking with Migliaccio at any time after the latter's escape.
Most of the State's case went without any dispute. Hence there was no question but that defendant did speak with Migliaccio on the telephone on November 18, 1974. The content of that conversation was before the jury in the form of its transcription. Similarly, there was no question but that defendant, under oath before the grand jury, denied that such a conversation had taken place. Failure to report the conversation and the knowledge it imparted concerning corruption at the workhouse provided the basis for the misconduct charge and there was never any dispute but that defendant never made such a report. The sole issue raised by the defense concerned the intent with which defendant's sworn denial of the phone conversation was made and the reason for his failure to report it. Defendant contended that his reason for denying the conversation was that he had forgotten that it had occurred. The same reason underlay his failure to report its contents to the authorities.
In support of this contention, defendant testified that 13 days prior to the November 18 taped conversation with Migliaccio he had been involved in an automobile accident *439 causing a head injury which resulted in a form of anterograde amnesia. This condition impaired his memory for the period following the accident, including the date on which the phone call was made. Defendant remained out of work, because of the injuries received, from the date of the accident until the Monday following Thanksgiving. Defendant testified that on his return to work his recollection of his convalescence was vague. He did not recall receiving any telephone calls during the three-week period following the accident, although he was able to recall, without difficulty, events which preceded it. Both his wife and daughter confirmed his faulty memory during that critical period.
Medical testimony was adduced on both sides. As usual, divergent views were expressed. We are not here concerned with weighing this testimony except to note that a jury question concerning the existence and extent of memory impairment was created thereby.

Entrapment
At the close of the State's case defendant moved to dismiss the charges against him on the ground that he was entrapped into committing perjury and misconduct in office. These motions were denied. A subsequent request to charge the elements of that defense was rejected. On appeal defendant argues that the defense of entrapment was established as a matter of law and, alternatively, that the trial judge erred in declining to submit the issue to the jury.
Entrapment bars prosecution for crime when the criminal conduct results from the creative activity of law enforcement officials. State v. Talbot, 71 N.J. 160, 165 (1976); State v. Dolce, 41 N.J. 422, 430 (1964). Official conduct which implants in the minds of an innocent person the disposition to commit the crime and hence induces its commission in order to prosecute is the essence of the defense. Id. It reflects a policy that government should not be used to entice the innocent into commission of crime *440 which they would otherwise not commit on their own. In this connection, the disposition of the defendant to commit a crime becomes a relevant issue. State v. Dolce, supra at 433. Where, however, the part played by the State in the inducing of criminal conduct becomes intolerably great, prosecution may be barred despite a defendant's criminal predisposition. State v. Talbot, supra, 71 N.J. at 167-68: "Whether the police activity has overstepped the bounds of permissible conduct is a question to be decided by the trial court rather than the jury."
Applying these standards to the evidence adduced in this case, we find no suggestion of entrapment. Clearly, there was no official inducement to fail to report Migliaccio's phone call and its contents. Nor was there any inducement to deny, under oath, that it had occurred. Defendant was free to testify as he wished before the grand jury and to report the phone call. We perceive no basis whatever for concluding that the offenses with which defendant is charged resulted from the creative activity of law enforcement officials.
Nor is this a case where the nature of law enforcement activity transcends permissible bounds of fairness and prosecution for the ensuing criminal conduct is to be barred on that ground alone. State v. Talbot, supra. The prosecutor's office was duty bound to investigate the implications of Migliaccio's accusations of corruption at the workhouse. According to Migliaccio's information, admittedly of a hearsay nature and hence both suspect and not usable as evidence, defendant was part and parcel of the corrupt scheme whereby money was paid to secure favorable inmate treatment. The Migliaccio-defendant phone call of November 21, 1973, taped by the prosecutor's office, was a legitimate device for determining whether defendant was or was not involved. There is no possibility that this device was used with knowledge that defendant would, under oath before a grand jury, deny that it had occurred. At that time the prosecutor's office could not have known that defendant would even be appearing before a grand jury. The fact that defendant would deny that the *441 phone call had taken place did not become apparent until he denied the call during his taped conversation with Hutchinson. The denial was undoubtedly, on its face, a suspicious circumstance and the prosecutor could properly, as he did, summon defendant to the grand jury to plumb the depths of his knowledge of the incident under oath. The best that can be said for defendant's position is that the prosecution summoned defendant to testify, aware of the possibility that perjury would be committed. The mere fact that the prosecutor knew the truth of the matter about which inquiry was made before the grand jury does not stamp such inquiry with the stigma of entrapment.
This case is readily distinguishable from State v. Redinger, 64 N.J. 41 (1973). In Redinger defendant had already testified falsely during the course of a trial. The indictment charging that offense was upheld. What was stricken was a charge of perjury based upon the same false testimony, extracted, however, for the sole purpose of grounding a second prosecution for perjury. There it was known how he would testify because he had previously so testified under oath. Furthermore, no reason for the testimony existed except to found a second charge of perjury. It was this conduct which was found to be so wanting in fundamental fairness as to bar prosecution.
In this matter, however, defendant's grand jury appearances were the first occasion on which defendant, under oath, was questioned concerning Migliaccio's charges of corrupt activity. During the course of his testimony he was asked whether he had received a phone call from Migliaccio following his escape from the workhouse. He was at liberty to testify as he wished. Indeed, as we see it, there was little reason for him to have lied with respect to it. The contents of the call were at best equivocal. He denied receiving money, except for the $100 which was pressed on him by Loffredo for a reason unknown to him. He evinced total ignorance concerning the receipt of money by Storcella and Loffredo. Hence, the prosecution could not have necessarily expected the *442 denial except for the fact that defendant had previously denied the conversation to Hutchinson, but not under oath. Moreover, his testimony was received in connection with a grand jury inquiry into corruption. There is no real suggestion that defendant was compelled to testify in hope that he would perjure himself so that a prosecution for that offense would ensue.
Finally, with respect to the misconduct charges, his failure to report the phone calls to the proper authorities, we discern no possibility of any valid plea of entrapment. His failure to report was of his own making, not that of law enforcement.
We, therefore, conclude that the trial judge correctly declined to charge the jury on the entrapment defense.

Burden of Proving Amnesia
We are, however, more concerned with defendant's second point of argument wherein he challenges the propriety of the judge's charge with reference to the evidence adduced by the defense concerning the reason defendant was unable to recall the November 18 phone call. As noted previously, defendant contended that he did not lie before the grand jury when he denied he had received the phone call from Migliaccio because he had no recollection of that call when he testified. The reason given for lack of recollection was the automobile accident that had occurred about 13 days before the phone call, in which he received a head injury which caused an impairment to his memory during the period of his convalescence. Lack of recollection for the same reason also formed the basis of the defense to the misconduct charge; according to defendant, he did not make the report of the call because he lacked recollection that he had received it.
The judge instructed the jury, quite properly, concerning the elements of the offense of perjury, including the requirement that the State prove, beyond a reasonable doubt, that "defendant knew that he was making a false statement *443 and that he made it intentionally." The judge properly identified a "knowing untruth" as the gist of the offense.[4] Hence, under this charge, correct as we perceive it and unchallenged by defendant, the State was required to prove beyond a reasonable doubt that when defendant, under oath, denied that he had received the phone call from Migliaccio, he remembered that phone call and intentionally lied concerning it. Although the required standard could be met by circumstantial as well as direct evidence, and subjectively determined issues such as intent must ordinarily be determined by inference, the jury must be convinced beyond a reasonable doubt as to this fact before a conviction would be authorized.
In this context the following portions of the jury instructions are in error. In them the trial judge analogized the import of defendant's evidence concerning his alleged amnesia to a defense of mental illness for which defendant was burdened with proving the affirmative of that fact by a preponderance of the evidence. Hence, the judge charged the jury that if they concluded that the State had successfully proved each and every element of the crime of perjury, including *444 the controverted issue of intent, beyond a reasonable doubt, they must then go on to consider the defense of mental illness or amnesia. Accordingly, the jury was instructed that "to establish mental illness as a defense to the criminal charges in this case the defendant must prove by a preponderance of the believable evidence that during the periods in question he was suffering from a mental illness, that is loss of memory, in other words, amnesia."
The issue raised requires analysis of the relationship between the perjury and misconduct charges and the evidence of amnesia properly admitted by the trial judge. In a prosecution for perjury or false swearing (N.J.S.A. 2A:131-4) the State must prove not only that the defendant swore falsely, State v. Fuchs, 60 N.J. 564, 568 (1972), but it must prove, beyond a reasonable doubt, that the defendant intentionally testified to something he knew to be false. As noted in State v. Fuchs:
* * * The Legislature intended to reach a witness who gives false testimony with a sense of wrongdoing. It would serve no public end, and indeed would disserve the judicial process, if every witness ran the risk that every misstatement could be found without more to have been made intentionally and with an awareness of falsity. [at 568]
See also, State v. Doto, 16 N.J. 397, 403-405 (1954), cert. den. 349 U.S. 912, 75 S.Ct. 601, 99 L.Ed. 1247 (1955); State v. Siegler, 12 N.J. 520, 524 (1953); State v. Lombardo, 20 N.J. Super. 317, 322 (App. Div. 1952). Defendant is not burdened with proving the nonexistence of this essential element of the State's case.
Defendant's testimony concerning his amnesia, and the expert testimony given in its support, can only be understood as being relevant to the intent with which he made his false statement. By this testimony defendant was attempting to rebut an inference that he consciously lied under oath by showing that he did not recall the phone call at the time he denied receiving it. Hence, the amnesia evidence was not *445 being received in support of an affirmative defense, that is, by way of confession and avoidance, or as a justification or excuse for conduct which would otherwise be criminal, see State v. Chiarello, 69 N.J. Super. 479, 498-500 (App. Div. 1961), certif. den. 36 N.J. 301 (1962), but to create a reasonable doubt concerning the existence of an essential element of the offenses with which he was charged and as to which the State, not he, bore the burden of proof. Id.
The role that the amnesia evidence played in the trial was, in our view, improperly analogized by the trial judge to the role played by evidence of insanity offered in support of an affirmative defense of insanity to excuse otherwise criminal conduct. The amnesia evidence under consideration was not offered for that purpose nor could it be. State v. Pugh, 117 N.J. Super. 26, 35 (App. Div. 1971), certif. den. 60 N.J. 22 (1972). Had the jury concluded that defendant did prove amnesia by a preponderance of the evidence, their verdict would not have been "not guilty by reason of amnesia," but rather "not guilty," because they would be announcing their conclusion that the crime of perjury and misconduct did not take place.
A more apt analogy would have been to the so-called defense of alibi. Evidence concerning it is received, not as a separate defense as to which a defendant bears a burden of proof, but in rebuttal of an essential element of a State's case, the defendant's necessary presence at the scene of the crime. Obviously, where a defendant's presence at the scene of a crime is necessary for its commission, the State must prove that he was present. By adducing evidence in support of a contention that he was not present, a defendant is not thereby burdened with proving the absence of that essential element of the crime. State v. Peetros, 45 N.J. 540, 552-554 (1965); State v. Steele, 92 N.J. Super. 498, 507 (App. Div. 1966). Similarly, a defendant who asserts that he forgot the existence of a fact when he testified as to its nonexistence is not burdened by proving that he did not recall, that his testimony was based upon a faulty memory. *446 The mere fact that he provides the jury with the alleged reason for his faulty recollection does not serve to shift to him the burden of proving that reason.
Indeed, it has been recognized that "amnesia is present to some degree in everyone * * *." Note: "Amnesia: A Case Study in the Limits of Particular Justice," 71 Yale L.J. 109, 136 (1961); see State v. Pacheco, 106 N.J. Super. 173, 178 (App. Div.), aff'd o.b. 54 N.J. 579 (1969), cert. den. 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 65 (1970). (amnesia as bearing on competency to stand trial). Amnesia may be traumatically induced, as is alleged in this case, or may exist by reason of age or because of mere lapse of time between the event and when its recollection is required, or merely because an individual is constituted with a faulty memory. But whatever its cause, the failure of the State to prove, in a perjury or false swearing case, that the defendant intentionally lied under oath, that is, he testified to a fact conscious of its untruth, must result in an acquittal. If a jury, on the other hand, concludes beyond a reasonable doubt that the State has proven that defendant consciously lied under oath, that conclusion necessarily resolves the issue as to whether he recalled the fact about which he testified falsely. They would accordingly reject any contention that he forgot, from whatever cause.
The same analysis holds true with respect to other crimes requiring for their commission a specific intent. First degree murder, for example, requires state proof beyond a reasonable doubt as to premeditation, deliberation and design. Hence, evidence of any mental defect, deficiency, trait, condition or illness which rationally bears upon the question of whether those mental operations did in fact occur must be accepted, and this holds true whether or not proffered evidence of a mental defect measures up to the requirements of the McNaughton Rule. Acceptance of mental illness in rebuttal of premeditation negatives the conclusion that first degree murder has been committed, whether or not defendant was legally insane. The acquittal of that crime *447 for that reason would not be by reason of insanity but simply because defendant was not guilty of first degree murder. See State v. DiPaolo, 34 N.J. 279, 294-96 (1961). As stated in Wilson v. State, 60 N.J.L. 171, 184 (E. & A. 1897), quoted with approval in State v. DiPaolo:
When the character and extent of a crime is made by law to depend upon the state and condition of the defendant's mind at the time, and with reference to the act done, intoxication, as a circumstance affecting such state and condition of the mind, is a proper subject for inquiry and consideration by the jury. If, by law, deliberation and premeditation are essential elements of the crime, and by reason of drunkenness or any other cause it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed; there is a failure on the part of the state to prove the crime into which premeditation must enter. [34 N.J. at 296; emphasis supplied]
We have italicized "or any other cause" and the reference to the State's failure to prove intent to demonstrate that whatever the cause of a lack of the intent required by positive law for the commission of a given crime, where the intent has not been proved, the crime has simply not been committed. Defendant's amnesia proofs in this case must be regarded as an attempt to create reasonable doubt and not an attempt to fulfill his burden to disprove an essential element of the State's case.[5]
*448 The charge as it was delivered to the jury in the case contained an irreconcilable inconsistency with respect to the burden of proving the sole fact in issue, defendant's recollection of the November 21 phone call and its contents. The jury was, in the same charge, instructed, on the one hand, that the State was required to prove this intent beyond a reasonable doubt and, on the other hand, that defendant was required to prove amnesia, the reason for the absence of intent, by a preponderance of the evidence. If, however, the State's burden was to prove intent beyond a reasonable doubt, defendant's burden, if one were to conceive that he had any, was to create that reasonable doubt, not to do more than that by proving lack of intent by a preponderance of the evidence. The burden of proof with respect to that issue had to be placed on one party or the other; it could not, consistent with any form of logic, be imposed upon both. And yet, that is exactly what was done in this charge.
The State argues, however, that even assuming the charge to be erroneous, the error favored defendant because it provided him with an unauthorized means of avoiding conviction, and hence was harmless. According to this argument, as we understand it, the charge instructed the jury that the State was burdened with proving, beyond a reasonable doubt, each and every element of each offense, including the critical element of intent. It was only when and if they concluded that the State had met this burden that they were to consider the so-called "affirmative defense" of amnesia. Hence, even though the State proved the commission of the offense, defendant was afforded the opportunity of nonetheless escaping conviction by successful proof of his amnesia.
Although this argument is a possible one under the charge given, we are nonetheless not persuaded that the error *449 was harmless. In describing the State's burden with respect to proof of intent, the judge made no reference to amnesia. He simply instructed the jury that the State must prove that defendant intentionally swore falsely knowing his testimony to be false. Specific discussion of the amnesia evidence was undertaken only in connection with the "affirmative defense" of mental illness, and here the jury was instructed several times that defendant was required to prove that defense by a preponderance of the credible evidence. Hence, at best, the jury would have been confused by the inherent contradiction in the charge; at worst, they would have applied the burden specifically described in connection with the amnesia evidence they would be considering.
Nor do we consider the following instruction as saving the day:
Remember, ladies and gentlemen, that although the burden rests upon the defendant to establish the defense of mental illness by a preponderance of the believable evidence, the burden of proving the defendant guilty of misconduct in office and perjury beyond a reasonable doubt is always upon the State and that burden never shifts.
First, we can extract little meaning from this instruction when it is considered in the context of this case and the other instructions contained in the charge. Second, the same contradiction inherent in the allocation of the burdens of proof affects this instruction as well. We lack confidence that defendant's convictions were based upon a jury conclusion of guilt beyond a reasonable doubt rather than on the failure of defendant to persuade the jury that he was probably suffering from amnesia when he testified that he received no phone call from Migliaccio, and that his amnesia resulted in the failure to report the call.
The only controverted issue in the case was defendant's intent. The other elements of both crimes were largely admitted or, at least, established by proof which could not be successfully disputed. Whatever our personal belief in the merits of defendant's contention that he was suffering *450 from amnesia as explaining his lack of recollection, it was the only controverted issue in the case and defendant was entitled to jury consideration of it under correct principles of law.
In summary, we conclude that the error in the charge cannot be overlooked as harmless and that a new trial is required. In the retrial the jury should be charged that the State must prove beyond a reasonable doubt each and every element of both offenses. With respect to the evidence offered in support of defendant's contention that he was suffering from amnesia, the jury should be instructed that consideration should be given to such evidence as it bears on the intent with which defendant denied the Migliaccio telephone call and failed to report its contents, and if as a result they entertain a reasonable doubt as to his guilt of either charge, they should find defendant not guilty of such charge. If, however, after considering the evidence, they are persuaded of defendant's guilt beyond a reasonable doubt, they should convict.
Since this matter will have to be retried, we comment briefly on defendant's contention that the "materiality" component of a perjury charge is an issue of fact for the jury and not one of law for the court. Settled law holds that the issue of materiality is a legal one to be determined by the trial judge. State v. Lupton, 102 N.J.L. 530 (Sup. Ct. 1926); Gordon v. State, 48 N.J.L. 611 (E. & A. 1886); State v. Winters, 140 N.J. Super. 110, 113 (Cty. Ct. 1926). See also, State v. Thrunk, 157 N.J. Super. 265 (App. Div. 1978). Hence, no error occurred in rejecting defendant's request to charge the jury on materiality.
Moreover, we are convinced that the responses given by defendant in his testimony before the grand jury were material in that they had "`a natural effect or tendency to influence, impede or dissuade the grand jury from pursuing its investigation.'" United States v. Carson, 464 F.2d 424, 436 (2 Cir.1972).
*451 Defendant's other contentions lack merit.
Reversed and remanded for a new trial.
ALLCORN, P.J.A.D. (dissenting).
Although I concur with the views of the majority in all other respects, I cannot accept its position that the burden is upon the State to prove beyond a reasonable doubt that defendant was not suffering from amnesia at the time of the alleged commission of the offenses.
As the majority notes, defendant does not challenge or deny that he was a party to the telephone conversation in question or that the recording of that conversation is an accurate one. Neither does he controvert that when he appeared before the grand jury he denied under oath that such telephone conversation had taken place. Hence, the thesis of the majority that the defense of amnesia is not akin to a plea of confession and avoidance as in the case of a defense of mental incapacity is, quite simply, inaccurate. Rather, the two subjective defenses are closely analogous to one another, if not virtually identical. Both concern a question of mental capacity. In each instance, a mental defect is claimed by the defendant. Essentially, he concedes that he may have committed the act with which he is charged, but contends that if he did commit the act he is not answerable criminally because his mental condition at the time was such that he was incapable of formulating the intent required in order to render him criminally liable.
The purported differentiation in the wording of a jury's verdict in an insanity case from that in an amnesia case, advanced by the majority in support of its position, is a mere matter of form. Depending upon which of the two specific defenses is raised, the wording of the verdict necessarily follows a given format as a matter of basic mechanics. Certainly, if the verdict returned in the amnesia case were, "Not guilty, by reason of amnesia," this finding of non-guilt could not be vitiated. In short, this is an argument in which form prevails over substance in a very real sense.
*452 Once the State has proved beyond a reasonable doubt that the defendant committed the criminal act charged, if the defendant seeks to escape criminal responsibility for the act by reason of a mental deficiency, there is nothing improper or illogical in imposing upon the defendant the burden of affirmatively proving by a preponderance of the credible evidence that, at the critical time or times, he was suffering from a mental condition which deprived him of the capacity to form the requisite intent.
The majority analogizes the charges here under review to "other crimes * * * requiring a specific intent," such as first degree murder. It is postulated that in any such crime, "evidence of any mental defect, deficiency, trait, condition or illness which rationally bears upon the question of whether those mental operations did in fact occur must be accepted * * * whether or not proffered evidence of a mental defect measures up to the requirements of the McNaghton rule." The proposition so advanced is lacking in supportive authority. Moreover, it runs counter to our controlling law.
Thus, not only is insanity an affirmative defense which must be established by the defendant by a preponderance of the evidence, but the same is true of any defense founded upon any other mental defect, trait or deficiency that affects intent envisaged by the majority. Under our law, mental incompetence "is an affirmative defense which the defendant must establish by a preponderance of the evidence." State v. Lewis, 67 N.J. 47, 48 (1975). Similarly, in those first degree murder cases in which voluntary intoxication is asserted to establish a lack of mental capacity to formulate necessary intent, the burden is upon the defendant affirmatively to prove the defense by a preponderance of the evidence. State v. Tune, 17 N.J. 100, 115 (1954), cert. den. 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243 (1955).
In sum, just as there is no burden upon the State to prove that a defendant is sane, there is no burden upon the State to prove that a defendant was not affected mentally as a result of his intoxication. It follows that there is no burden on *453 the State here to prove that defendant was not mentally affected by amnesia or some other mental defect. As so aptly stated in State v. DiPaglia, 64 N.J. 288 (1974):
New Jersey adheres to the rule that in a criminal case the State does not have to prove that the defendant is sane. If insanity is raised as a defense, the defendant has the burden of proving insanity and unless he does so by a preponderance of the evidence he stands in the position of a sane person responsible in law for his actions. * * * [at 293]
And so here. The defendant is presumed to be suffering from no mental defect, be it insanity, amnesia, intoxication or some other deficiency. Consequently, the State does not have to prove that defendant is free from such mental defect. If, as here, amnesia is raised as a defense, defendant has the burden of affirmatively proving such amnesia, and, unless he does so by a preponderance of the evidence, he stands in the position of a person having no mental defect who is presumed to have intended and to be responsible in law for his acts. The charge to the jury in this case represents a proper exposition of the law.
For the foregoing reasons, I would affirm the convictions of defendant on both charges.
NOTES
[1] Defendant was at home on sick leave at the time because of an automobile accident which occurred about 13 days before this phone call. This accident and the alleged injuries sustained by defendant largely provided the basis for the defense.
[2] The telephone call occurred over four months after Migliaccio's escape.
[3] Here, Migliaccio informs the warden that money passed "while I was out," not during the period of his incarceration.
[4] The charge reads as follows:

The elements which the State must prove beyond a reasonable doubt are as follows:
1. That the defendant knowingly made a false statement. For a statement to be false it must be proven to be untrue, a statement which is inconsistent with the truth.
The word, "false," carries an implication of a purpose to deceive. It implies a wrong and signifies a knowing untruth.
Falsity as used in this element means that the statement must not only be false in fact, but that the defendant knew it was false when he made the statement.
2. The second element, that the false statement was made wilfully. This means that the State must prove that the defendant knew that he was making a false statement and that he made the statement intentionally. * * *
3. Thirdly, corruptly means that the statement was made with a wrongful design.
4. Fourth and final element is that the defendant made the false statement during a judicial proceeding while he was under oath.
[5] Our dissenting colleague properly notes that a defendant seems to be burdened with proving a degree of voluntary intoxication sufficient to negate a required specific intent. Reference in this context is made to State v. Tune, 17 N.J. 100, 115 (1954), cert. den. 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243 (1955). Although Tune does contain language to that effect, we question whether such was the holding of the case. In Tune defendant contended that the charge as given suggested that defendant was burdened by a degree of proof higher than a mere preponderance. The Supreme Court, in the language relied on by our dissenting colleague, merely disagreed with that contention, finding that the charge did nothing more than impose upon defendant the burden of proving voluntary intoxication by a simple preponderance of the evidence. Nothing in Tune suggests that the court considered the issue as to where the burden of proving voluntary intoxication was to be imposed when its purpose was to disprove specific intent.